Filed 3/23/26  In re D.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re D.L. et al., Persons Coming Under
the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E087396 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000244) |
| v. | OPINION |
| N.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Walter H. Kubelun,
Judge.  Conditionally reversed and remanded with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and
Appellant.

Minh C. Tran, County Counsel, Jamila T. Purnell, and Larisa R-McKenna, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant and appellant, N.L. (Father) appeals from the juvenile court's order terminating parental rights as to his 10-year-old son D.L., seven-year-old daughter J.L., and six-year-old son N.L. (Welf. & Inst. Code,[1] § 366.26). Father contends that the juvenile court and plaintiff and respondent, the Riverside County Department of Public Social Services (DPSS), failed to comply with the duty of inquiry requirements under the Indian Child Welfare Act of 1978 (ICWA)[2] (25 U.S.C. § 1901 et seq.) and related state law.[3] For the reasons set forth *post*, we conditionally reverse and remand this matter to the juvenile court.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *General Background*

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*), overruled on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18. (*Dezi C.*).)

[3] G.I. (Mother) had passed away six months prior to the dependency proceedings.

2

The family has a prior history with DPSS. In April 2020, DPSS received an immediate response referral alleging general neglect of the children by the parents. In May 2020, a section 300 dependency petition was filed on behalf of the children. In July 2020, the children were declared dependents of the court and remained in the care of Mother on family maintenance services. Father was provided with supervised visitations and services. In December 2021, at the 18-month status review hearing, Father's reunification services were terminated and the court ordered additional six months of family maintenance services for Mother. By June 2, 2022, the dependency was terminated with the children to remain in Mother's care. Father was provided with visitation once a month for two hours.

On June 26, 2023, DPSS received a referral alleging allegations of general neglect and physical abuse of the children by Father. Mother had died by homicide and there was an ongoing police investigation. The home was reported to be dirty with cockroaches and rats, there was no food in the home, and D.L. reported Father had been hitting the children on the head with his hand. Father got into a car crash while drinking and driving with the children in the car. Father was reportedly drinking and using drugs and going to bars at night with the children, leaving them in the car while they slept. Father was out on bail with robbery at gunpoint charges and admitted to using marijuana. He also reported a past drug history of methamphetamine use. Since Mother's death, Father isolated the children from Mother's side of the family.

The maternal aunt, K.I., who lived next door to Father, claimed that the children were safe and under her care when they were not with Father and confirmed Father spanked the children. The paternal grandmother provided DPSS with Father's contact information as he was away with the children when the social worker came to his home to investigate the allegations. Father reported that the children spent a lot of time with his family, including the paternal grandparents, and denied the allegations. In August 2023, Father had been evicted from his home and he and the children were living with the paternal grandmother, the paternal grandmother's husband, two paternal uncles, and a paternal cousin.

Following further investigation, on September 14, 2023, a petition was filed on behalf of the children pursuant to section 300, subdivision (b)(1) (failure to protect) based on Father's general neglect of the children and Father's history of abusing drugs. The petition noted that there was a reason to believe the children were or may be Indian children. The children remained in Father's care with DPSS oversight. A first amended section 300 petition was later filed.

The detention hearing was on October 6, 2023. The court adopted DPSS's recommendations and maintained the children in Father's care with DPSS supervision. By October 11, 2023, the juvenile court detained the children from Father's custody based on Father's positive drug test result for cocaine. Three relatives were identified as possible relative placement for the children, including the paternal aunt, the paternal grandmother and the paternal great-grandmother.

At a hearing on November 2, 2023, the foster mother, the maternal aunt and Father were present. The maternal aunt requested placement of the children in her care, as well as extended visits with the children. The children's attorney reported that the children wanted to see the maternal aunt, the maternal grandmother, and a maternal uncle, and the maternal aunt's husband. The juvenile court denied the request for extended visits and placement at that time and ordered DPSS to assess the maternal aunt's requests.

The juvenile court took jurisdiction of the instant matter on November 15, 2023. The court found true all of the allegations in the first amended petition, except one of the allegations, declared the children dependents of the court, and provided Father with reunification services. The children remained placed with their foster parent.

Father was eventually convicted of three counts of robbery and incarcerated in state prison for a total term of five years. He was receiving services while incarcerated.

The six-month review was held on May 1, 2024. The maternal aunt and maternal grandmother were present at the hearing. Father, however, was not present as he was not transported from prison. The hearing was thus continued.

On July 1, 2024, the children were placed with the maternal aunt. Father's services were continued at the July 11, 2024, six-month review hearing.

DPSS recommended terminating Father's services and setting a section 366.26 hearing. Father was still incarcerated and his release date from prison was unknown. However, by the time of 12-month review hearing on December 4, 2023, DPSS changed its recommendation and recommended Father's services continue. Hence, at that time,

the juvenile court continued Father's reunification services and ordered visitation for Father once a month through letters and updates.

Father's telephonic visits with the children caused the children to be frustrated, anxious or fearful as he had been observed yelling at the children. D.L. often did not wish to speak to Father and J.L. acted out after telephone visits with Father. D.L. and J.L. expressed that they did not wish to return to his care. On February 11, 2025, the juvenile court found telephone contact with Father to be detrimental and modified the visitation orders by halting telephonic contact between the children and Father but allowed Father to continue to receive photographs of the children.

By March 27, 2025, DPSS recommended terminating Father's services and setting a section 366.26 hearing. Father's expected release date from prison was August 27, 2025. Father received services while incarcerated, however, DPSS was unable to verify how engaged Father was in services, what the programs covered, how he had benefitted from the services, and whether he had successfully completed his services. In addition, DPSS was unable to verify Father's release plan and ability to adequately and appropriately care for the children.

Father's reunification services were terminated on April 10, 2025, at the 18-month review hearing, and a section 366.26 hearing was set to establish a permanent plan for the children.

By September 29, 2025, DPSS recommended terminating Father's parental rights and freeing the children to be adopted by their maternal aunt and her husband (the

prospective adoptive parents).  The children had been placed with their prospective adoptive parents since July 1, 2024, and were thriving in their home.  The prospective adoptive parents sought adoption to provide the children with permanency and stability and desire to help them through the grieving and traumatic experience of their mother's loss by guiding them toward a positive future and keeping them close to family.  The children recently began referring to the prospective adoptive parents as "'mom'" and "'dad'" and expressed feeling happy and excited about being adopted by them.  The children were observed to have a strong bond with their prospective adoptive parents.  The prospective adoptive parents met the children's financial, emotional, physical, mental, and developmental needs, and both sides of the family were in agreement of the adoption.

Father was recently released from prison and the September 29, 2025, section 366.26 hearing was continued at Father's request.

On October 23, 2025, D.L. and J.L. stated that they did not wish to speak with Father and did not want to write him any letters.  Father had yet to provide letters to the children.  The children's therapist reported that it would be detrimental for the children's emotional well-being to have visitation with Father.

The section 366.26 hearing was held on November 3, 2025.  At that time, Father, the maternal aunt and uncle, and the maternal grandmother were present.  The juvenile court found the child to be adoptable and terminated Father's parental rights.  The court

noted visitation would be at the discretion of the caregivers once adoption proceeds. Father timely appealed.

B. *ICWA Background*

In an out of custody report, DPSS reported that ICWA does or may apply. On July 3, 2023, Father stated that he has Cahuilla ancestry, but he was not registered. On August 31, 2023, the paternal grandmother, Y.M., stated she is registered as Cahuilla Designo Indian. She stated her father, N.L., is also registered with Cahuilla Designo. She denied the children being registered with Cahuilla Designo. On September 11, 2023, Tribal Social Worker for the Cahuilla Band of Indians (Cahuilla) was contacted and advised DPSS that neither Father nor the paternal grandmother were a member of the Cahuilla tribe. On this same day, staff at the Agua Caliente Band of Cahuilla Indians (Agua Caliente) advised that Father and the paternal grandmother were not enrolled with the Agua Caliente tribe.

At the October 6, 2023, detention hearing, Father's counsel reported that Father had Native American ancestry through the Agua Caliente tribe and that he was enrolled in the Cahuilla and Delguino tribes. Father was present and the juvenile court did not personally inquire of Father's Native American ancestry. In addition, the record contains no evidence that Father filed an ICWA-020 Parental Notification of Indian Status form (ICWA-020). The court found DPSS had conducted an adequate ICWA inquiry and that ICWA did not apply.

The paternal grandmother stated she had Native American Ancestry including 1/32 Diegueno and 1/32 Cahuilla and declined tribal representation. She resided with the paternal grandfather, two paternal uncles, Father and his three children. Father later clarified that he was raised by his stepfather because his biological father had been in prison since Father was two years old. Father also stated he had two brothers and his half sister passed away when he was younger.

In November 2023, DPSS reported that ICWA did not apply and that the court found ICWA did not apply at the October 11, 2023, detention hearing. DPSS noted that while Father and the paternal grandmother reported having Native American ancestry with the Cahuilla tribe, the paternal grandmother, the paternal great grandmother and Father were not registered members of the tribe. DPSS also noted that the court found ICWA did not apply in a prior dependency case with the family. However, in an addendum report dated November 15, 2023, DPSS first reported that ICWA may apply, but later reported ICWA does not apply.

On November 2, 2023, Father reported that the paternal grandmother was registered with the Soboba tribe.

In a letter dated November 9, 2023, the ICWA noticing clerk sent a further inquiry letter to the Soboba tribe, the Bureau of Indian Affairs (BIA), the Agua Caliente tribe, Augustine Band of Cahuilla, Cabazon Band of Mission Indians, Cahuilla Band of Mission Indians, Los Coyotes Band of Cahuilla Indians, Morongo Band of Indians, Ramona Band of Cahuilla Indians, Santa Rosa Band of Cahuilla Indians, Soboba Band of

9

Luiseno Indians, and the Torres-Martinez Desert Cahuilla Indians. The letter was sent by certified mail to the identified tribes and requested, "Please indicate if additional information is needed by your tribe to make a membership and/or eligibility determination." The letter included the names and birthdates of the children, Father, Mother, the paternal grandmother, the paternal great-grandmother, the paternal great-great grandmother, the paternal grandfather (date of birth listed as unknown), the paternal great-grandfather, the maternal grandmother, and the maternal aunt. As to Mother and her relatives, DPSS noted ICWA does not apply. The letter stated the noticing clerk spoke with Father on November 2 and 9, 2023, and he confirmed the dates of birth for his great-grandmother and great-great grandmother. Father stated the paternal grandmother's enrollment number was unknown, however the paternal grandmother is recognized as Soboba.

At the November 15, 2023, jurisdictional/dispositional hearing, Father, the maternal aunt and the maternal grandmother were present. The juvenile court did not personally inquire of Father or the maternal relatives concerning Native American ancestry. Rather, the court took judicial notice of the further inquiry letters dated November 9, 2023, and found ICWA did not apply.

On April 30, 2024, DPSS filed tribal response letters from four of the tribes. The Torres Martinez Desert Cahuilla Indians stated Father, the paternal grandmother and the children were not enrolled in their tribe nor did they have applications pending. The Morongo Band of Mission Indians stated no identified family member was enrolled and

10

the children were not eligible for enrollment. The Soboba Band of Luiseno Indians stated neither the parents nor children were enrolled nor eligible for enrollment. The Cahuilla Band of Indians stated they did not recognize any of the relatives and the children were not eligible for enrollment.

At the hearing on May 1, 2024, the maternal grandmother noted that she had been to court previously and replied in the negative when the court had asked her whether she had been inquired about her Native American ancestry. The court then asked the maternal grandmother as to whether she had any Native American ancestry. The maternal grandmother replied that she had no Native American ancestry on her side of the family, but the children did on the paternal side of the family. The maternal aunt also indicated that she had no Native American ancestry. The juvenile court then found that ICWA did not apply, noting the maternal aunt and maternal grandmother both indicated no Native American ancestry and DPSS had conducted an ICWA inquiry with Father and had "gone through the process with him."

At a hearing on June 5, 2024, the maternal aunt, the maternal grandmother and the maternal uncle were present. The court inquired whether it had asked them about their Native American ancestry. The maternal aunt replied, "Yeah." The court then asked whether it had asked the maternal uncle whether he had any Native American ancestry and whether he spoke English. The maternal aunt replied, "[h]e understands, but not well." The court responded, "[t]hat's fine. I can't have you interpret." The court thus did not inquire of the maternal uncle.

11

On July 11, 2024, the juvenile court found proper ICWA inquiry was conducted and ICWA did not apply to the children.

On October 4, 2024 and March 11, 2025, the maternal aunt reported that she did not have Native American ancestry. DPSS attempted further inquiry with Father regarding Native American ancestry on December 27, 2024, February 11, March 11, 2025, July 24, and August 18, 2025, via telephone and written correspondence, but was unsuccessful.

At the April 10, 2025, 18-month review hearing, the juvenile court found ICWA did not apply.

At the November 3, 2025, section 366.26 hearing, the juvenile court inquired of the maternal aunt, the maternal uncle and the maternal grandmother as to whether they had any Native American ancestry. They all replied in the negative. The maternal aunt noted in the adoption assessment that her father (the maternal grandfather) passed away in 2022 and her sister (Mother) in 2023.

III.

DISCUSSION

Father challenges the order terminating parental rights on the grounds that the juvenile court and DPSS failed to comply with the inquiry requirements of ICWA and related California law. Father specifically asserts that DPSS never asked the paternal grandmother what her or paternal great-grandfather's tribal registration numbers were, and that DPSS did not inquire of paternal great grandmother, paternal uncle or maternal

12

grandfather regarding Native American ancestry.[4] DPSS asserts that no error occurred in failing to inquire of the maternal grandfather as he was not readily available, DPSS made repeated ICWA inquiries of Father and the paternal grandmother, and that DPSS was not required to inquire of every member of the extended paternal relatives.

ICWA is a federal law that gives Indian tribes "concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation." (*In re W.B.* (2012) 55 Cal.4th 30, 48.) The law was enacted to "further the federal policy ' "that, where possible, an Indian child should remain in the Indian community." ' " (*Ibid.*) To effectuate this policy, ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678 (*Ricky R.*), disapproved on other grounds in *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18.) California has adopted various procedural and substantive provisions of ICWA. (*In re E.C.* (2022) 85 Cal.App.5th 123, 138.) Consistent with ICWA, California law defines an "Indian child" as "[a]ny unmarried person who is under 18 years of age and is either of the following: [¶] (A) [a] member or citizen of an Indian tribe" or "(B) [e]ligible for membership or citizenship in an Indian tribe and is a biological child of a member or citizen of an Indian tribe." (§ 224.1, subd. (b)(1); 25 U.S.C. § 1903(4).) However, because it is typically not self-evident whether a child is an Indian child within the meaning of ICWA, federal and state law both mandate certain inquiries to be made in each case. (*Ricky R.*, at p. 678.)

---

[4] We note that the maternal grandfather passed away in 2022 per the maternal aunt's statement. Thus, no inquiry could be made of him.

Under California law implementing ICWA, the juvenile court, and the child protective agency have "an affirmative and continuing duty" to inquire whether a child who is the subject of a dependency proceeding is, or may be, an Indian child. (§ 224.2, subd. (a).) This continuing duty applies in all dependency cases (§ 224.2, subd. (a)) and can be divided into two phases—the initial duty to inquire and the duty of further inquiry. (*Ricky R.*, *supra*, 82 Cal.App.5th at p. 678; *In re T.G.* (2020) 58 Cal.App.5th 275, 290.) "If the initial inquiry gives the juvenile court or the [child protective] agency 'reason to believe' that an Indian child is involved, then the juvenile court and the agency have a duty to conduct 'further inquiry' (§ 224.2, subd. (e)(1)), and if the court or the agency has 'reason to know' an Indian child is involved, ICWA notices must be sent to the relevant tribes (§ 224.3, subd. (a); 25 U.S.C. § 1912(a))." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.)

Where the child protective agency has complied with its duty of inquiry and there is no reason to know that the child is an Indian child, the court may find that ICWA does not apply. (§ 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3)(A).) However, before the juvenile court makes such a finding, it must ensure the child protective agency has made an adequate inquiry under ICWA and related California law. (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 566-567 (*Dominick D.*).)

"A juvenile court's finding that ICWA does not apply implies 'that social workers [have] fulfilled their duty of inquiry.'" (*Dominick D.*, *supra*, 82 Cal.App.5th at p. 567.) We review the juvenile court's ICWA findings for substantial evidence, which requires us

14

to determine if reasonable, credible evidence of solid value supports the court's order. (*Ibid*; *In re D.F.* (2020) 55 Cal.App.5th 558, 565.) We will uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance. (*Dominick D.*, at p. 567; *D.F.*, at p. 565.) Although this is a deferential standard, " ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." ' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 602.) The juvenile court "may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from [an] inquiry that is not proper, adequate, or demonstrative of due diligence." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408.)

At issue in this case is the duty of initial inquiry as to some family members and the duty of further inquiry. In this case, it is undisputed that DPSS did not contact the paternal great-grandmother and the paternal uncle. In addition, it is undisputed that there was "reason to believe" the children were Indian children based on statements made by Father and the paternal grandmother. "When the Agency has a reason to believe a child is an Indian child, as in this case, it must satisfy three requirements. First, the Agency must interview the parents, Indian custodian, and extended family members to gather relevant information, specified by statute, regarding the details of the child's birth, family members, and possible tribal affiliations. (§ 224.2, subd. (e)(1); see also § 224.3, subd. (a)(5).) Second, the Agency must contact 'the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact

15

information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility.' (§ 224.2, subd. (e)(2).) Third, the Agency must contact 'the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility.' (*Id.*, subd. (e)(3).) The Agency's contact with the tribe 'shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' (*Ibid*.)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052-1053.) "Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under the federal Indian Child Welfare Act of 1978 (25 U.S.C. Sec. 1901 et seq.)." (§ 224.2, subd. (e)(2)(C).)

In this case, although DPSS inquired of some extended family members, there were available paternal relatives that could have provided meaningful information about the family's Native American ancestry, such as the paternal great grandmother and the paternal uncle, regarding the details of the children's birth, family members, and possible tribal affiliations. (§ 224.2, subd. (e)(1); see § 224.3, subd. (a)(5).) There was reason to believe the children were Indian children based on statements made by Father, his counsel and the paternal grandmother. Father stated that he has Cahuilla ancestry, but he was not registered. The paternal grandmother stated she is registered as Cahuilla Designo

16

Indian and that her father is also registered with Cahuilla Designo. Father's counsel reported that Father had Native American ancestry through the Agua Caliente tribe and that he was enrolled in the Cahuilla and Delguino tribes. Father was present and the juvenile court did not personally inquire of Father's Native American ancestry. In addition, the record contains no evidence that Father filed an ICWA-020 form. Furthermore, DPSS did not attempt to obtain the paternal grandmother's or the paternal great grandfather's tribal registration by inquiring of the paternal grandmother or readily available extended paternal family members. The tribal registration number may have assisted the tribes in determining the children's membership status or eligibility. (§ 224.2, subd. (e)(2).) As noted previously, for further inquiry, "[c]ontact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

Moreover, although the record demonstrates DPSS diligently contacted ten relevant tribes by sending a further inquiry letter to the tribes and the BIA. However, it is undisputed that not all tribes responded—four of the ten tribes responded. When the other tribes did not respond to DPSS's written inquiries, DPSS should have contacted the BIA to "seek assistance in contacting the Indian Tribe[s]." (25 C.F.R. § 23.105(c); § 224.2, subd. (e)(2)(B).) Accordingly, we must conditionally reverse and direct DPSS to comply with that requirement.

17

IV.

DISPOSITION

We conditionally reverse the juvenile court's order terminating Father's parental rights. On remand, DPSS shall inquire of the paternal great-grandmother and the paternal uncle and seek assistance from the BIA in contacting the tribes that did not respond to its written inquiries. If, after requesting assistance from the BIA and completing an inquiry based on that assistance or learning the BIA is unable to assist, neither DPSS nor the juvenile court has reason to know that the children are Indian children, the order terminating parental rights to the children shall be reinstated. Alternatively, if DPSS or the juvenile court has reason to know the children are Indian children, the court shall proceed according to statute.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


RAMIREZ
P. J.


MILLER
J.

18